ROBERT N. BURKLE ET AL. *v.* SUPERFLOW
MANUFACTURING COMPANY, INC., ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and COMLEY, Js.

Argued June 7—decided November 28, 1950—reargued
January 9—opinion amended February 2, 1951

*Alfonse C. Fasano* and *John Maresca,* for the appellant-appellee (named defendant).

*Arthur W. Chambers, Jr.,* and *Gordon P. Chambers,* with whom, on the brief, were *Thomas A. Grimes* and *Martin M. Merriam,* for the appellants-appellees (plaintiffs.)

COMLEY, J. The finding, which is not subject to

any material correction, discloses these facts: On or about February 1, 1946, the named defendant, hereinafter called the defendant, operated a machine shop in which it manufactured a line of plumbing supplies such as elbows, T's, bushings, lock nuts and couplings. It machined these parts from castings which it obtained from various foundries. In addition to these items, it also handled, but did not manufacture, other plumbing supplies such as float rods and lifts which it bought ready-made from others.

The plaintiffs were copartners doing business under the name of Connecticut Precision Hardware. They were engaged in the business of selling, as agents or brokers for manufacturers, various products, including plumbing tools and supplies. The territory in which they operated was restricted to the northeastern section of the United States, and they employed only one salesman to promote the sales of plumbing tools and supplies.

About February 1, 1946, a meeting was held between Robert Burkle, one of the plaintiffs, and John Moniti, who was then the defendant's president, at which a contract, not in writing, was made. By the terms of this contract as found by the trial court, the defendant "orally agreed for an unspecified time, to supply and the plaintiffs agreed to solicit orders for 7 or 8 plumbing items," and the defendant "further agreed to deliver within thirty days all orders procured by the plaintiffs and to pay the latter a commission of ten per cent on all orders procured by them." In the early part of March, Dominick Aiello succeeded John Moniti as the defendant's president, and in a conversation held at that time between Aiello and Robert Burkle the oral agreement previously made was confirmed without material change in its provisions.

During the first four months of the existence of this

agreement, the orders procured by the plaintiffs amounted to only $1126.50, but the plaintiffs increased their staff of salesmen for the defendant's products from one to four and expanded their territory to include twenty-seven states east of the Mississippi River, and commencing in June the volume of orders vastly increased. In June they amounted to $34,816.20, in July to $42,060.80, in August to $57,442.70, in September to $30,185.20, and in October, by which time the parties were engaged in litigation and the contract had been terminated, to $6251.80. About the first of July, the plaintiffs received complaints from some of their customers that deliveries promised within thirty days were not being made by the defendant. Robert Burkle discussed these complaints with Aiello, who assured him that the trouble was due to a temporary shortage of materials and that timely deliveries would be resumed within a week or ten days. After this discussion no orders were taken by the plaintiffs for a period of a few weeks and, thereafter, when orders were again solicited, the delivery date was increased from thirty to sixty days.

At the time the present action was brought, the defendant had delivered only $9867.10 worth of goods, whereas the orders obtained by the plaintiffs totaled $171,883.20. The defendant paid the plaintiffs the agreed commission of 10 per cent on the orders which were filled and delivered but it refused to pay on those which were not, despite the plaintiffs' repeated demands that it do so.

The defendant accepted all but two of the orders sent in by the plaintiffs. At all times the defendant could have obtained from various foundries the castings necessary for the manufacture of the goods ordered, and many of the items were in plentiful supply in the open market and could have been purchased

ready-made by the defendant. It had adequate materials and equipment to fill many more orders than it did.

Upon these facts, the trial court concluded that there was a valid, oral contract which the defendant had breached by its refusal to pay the agreed commissions on all orders obtained by the plaintiffs, but that the plaintiffs were only entitled to recover commissions on such orders as were obtained prior to July 1, 1946, since for some time prior to that date they had actual knowledge that the defendant could not fill the orders at the rate at which they were being sent in and it thus became their duty to mitigate the damage which they were suffering by refraining from the solicitation of further orders.

Both parties to the contract have appealed. In the view which we take of the case, it is necessary to consider only the defendant's appeal and only that part of it which is based upon the claim that the contract is unenforceable by reason of the Statute of Frauds. Section 8293 of the General Statutes provides: "No civil action shall be maintained . . . upon any agreement that is not to be performed within one year from the making thereof, unless such agreement, or some memorandum thereof, be made in writing, and signed by the party to be charged therewith, or his agent." It is the law of this state, as it is elsewhere, that a contract is not within this clause of the statute unless its terms are so drawn that it cannot by any possibility be performed fully within one year. *Appleby* v. *Noble,* 101 Conn. 54, 57, 124 A. 717; *Clark* v. *Pendleton,* 20 Conn. 495, 508; *Russell* v. *Slade,* 12 Conn. 445, 460; *Warner* v. *Texas & P. Ry. Co.,* 164 U. S. 418, 17 S. Ct. 147, 41 L. Ed. 495; 2 Williston, Contracts (Rev. Ed.) p. 1441, § 495; Restatement, 1 Contracts § 198.

Where the time for performance is definitely fixed

at more than one year, the contract is, of course, within the statute. *O'Leary* v. *Skilton,* 102 Conn. 475, 479, 129 A. 45; *Garber* v. *Goldstein,* 92 Conn. 226, 229, 102 A. 605; *Grant* v. *New Departure Mfg. Co.,* 85 Conn. 421, 424, 83 A. 212. If no time is definitely fixed but full performance may occur within one year through the happening of a contingency upon which the contract depends, it is not within the statute. Examples of this are a promise to support a person for life, since death may occur within the year; *Appleby* v. *Noble,* supra; a promise not to use premises for a certain purpose, since the promisor might die within the year; *Hall* v. *Solomon,* 61 Conn. 476, 483, 23 A. 876; a promise of marriage, since the event may happen within the year; *Clark* v. *Pendleton,* supra; and a promise the performance of which may or may not be required within one year at the option of the promisee. *Haussman* v. *Burnham,* 59 Conn. 117, 133, 22 A. 1065.

Also, contracts of employment for personal services are held generally not to be within the statute, since the death of the employee, which may occur at any time, puts an end to the agreement. See notes, 35 A. L. R. 1432, 1440; 135 A. L. R. 646, 688.

The contract in the present case does not fall within any of these categories. It binds the plaintiff partnership to solicit orders for an indefinite and indeterminable time in the future, and it obligates the defendant to pay commissions on all such orders. It is not a contract for personal service by an individual whose death within the year would end it. It is not an agreement to perform a single designated act or a series of designated acts, as to which the law might imply a reasonable time for performance. On its face it cannot possibly be performed fully within one year.

The claim is made that the dissolution of the plaintiff partnership within one year resulting from the death of

one of the partners would terminate the contract. If this were a contract for services to be rendered by one of the partners personally or one which required the exercise of peculiar skill, that would be true. *Ayres* v. *Chicago, R. I. & P. R. Co.,* 52 Iowa 478, 491, 3 N. W. 522; *Hughes* v. *Gross,* 166 Mass. 61, 65, 43 N. E. 1031; 6 Williston, op. cit., p. 5501 n. 8; 68 C. J. S. 768, § 272. But the dissolution of a partnership through the death of a partner does not terminate executory contracts which are not of a personal nature. *Feucht* v. *Corbett,* 214 Ind. 103, 107, 12 N. E. 2d 957; *Yahr-Donen Corporation* v. *Crocker,* 80 Cal. App. 2d 675, 678, 182 P. 2d 209; 40 Am. Jur. 339, § 301. This principle is succinctly stated in *National Surety Co.* v. *George E. Breece Lumber Co.,* 60 F. 2d 847, 849, as follows: "It is a general rule that, where a partnership has entered into an executory contract which remains unperformed in whole or in part at the date of the death of one of the partners, his death does not release the partnership from performance of such contract, in the absence of provision in the contract to that effect; and the existence of the partnership, with its active functions to be performed by the survivor, is continued until such contract has been fully executed."

It is also urged by the plaintiffs that, since all the members of a partnership may possibly die within a year, the contract is not within the statute. No case has come to our attention where the rule that the possibility of death within a year removes a contract from the statute has been extended to apply to the possibility of the death of more than one individual.

The breach of contract by the defendant within a few months resulted in termination of the contract, but the wrongful termination of an agreement is not performance. Performance means the fulfillment, not the defeat or frustration, of an agreement. *Cohen* v.

*Bartgis Bros. Co.,* 264 App. Div. 260, 261, 35 N. Y. S. 2d 206, aff'd, 289 N. Y. 846, 47 N. E. 2d 443; *Fish Clearing House, Inc.* v. *Melchor, Armstrong, Dessau Co.,* 174 Wash. 539, 542, 25 P. 2d 381; *Blake* v. *Voigt,* 134 N. Y. 69, 72, 31 N. E. 256; *Droste* v. *Harry Atlas Sons, Inc.,* 145 F. 2d 899, 900.

We cannot accept the view of the Massachusetts courts that contracts such as the one before us are not within the statute because the parties might have gone out of business within the year and their relations thus ended. *Edmund D. Hewins, Inc.* v. *Marlboro Cotton Mills,* 242 Mass. 282, 136 N. E. 159. Such a termination is obviously not the full performance contemplated by the parties. If that reasoning is followed, then all contracts which cannot be performed within one year could be taken out of the statute. If that result is desirable it must be accomplished by legislative rather than judicial action.

It is sometimes stated that a contract requiring continuing performance may be terminated at any time by either party upon the giving of reasonable notice and that, since such termination may take place within one year, the agreement is not within the statute. 1 Williston, Contracts (Rev. Ed.) pp. 104. An examination of the cases reveals that the application of this rule is limited to contracts where it would be unreasonable to attribute to the parties an intention that the contract should continue beyond the point where it had ceased to be mutually satisfactory to both. *Dover Copper Mining Co.* v. *Doenges,* 40 Ariz. 349, 357, 12 P. 2d 288; *Hess* v. *Iowa Light, Heat & Power Co.,* 207 Iowa 820, 826, 221 N. W. 194; *Clarkson* v. *Standard Brass Mfg. Co.,* 237 Mo. App. 1018, 170 S. W. 2d 407; Restatement, 2 Agency § 442. In 17 C. J. S. 887, § 398, it is pointed out: "Where no limitation as to time is expressed in the contract and it is not for personal

services and does not require the imposing of special confidence, or otherwise, by its inherent nature, does not imply a power of revocation, it cannot be regarded as terminable except by mutual consent, and it is presumably intended to be permanent and perpetual in the obligation it imposes." In 12 Am. Jur. 861, § 305, it is said: "Although there appears to be some authority to the contrary, the rule seems to be that where no limitation is expressed in the agreement, neither party can terminate it without the consent of the other, unless the nature of the contract itself indicates with sufficient clearness that the parties must have intended some other termination."

We cannot read into the contract in the present case a provision for termination at the will of either party. It is not a contract of employment, calling for the rendition of personal services. It is an agreement between two business concerns either of which might incur, as the plaintiffs in fact did and as the defendant should have done, substantial expense in the expansion of its facilities to meet expected continuing performance by the other. To hold that either could, at its option, bring the agreement to an end would be unreasonable. See *Kaufman Bros. & Co. v. Farley Mfg. Co.*, 78 Iowa 679, 686, 43 N. W. 612; *Fallon v. Chronicle Publishing Co.*, 1 MacArth. (8 D. C.) 485. A line of cases involving similar agreements by railroads differs from the case at bar because of the considerable property commitments, but the principle is the same. *East Tennessee Telephone Co. v. Paris Electric Co.*, 156 Ky. 762, 766, 162 S. W. 530; *Pitkin v. Long Island R. Co.*, 2 Barb. Ch. 221; *McKell v. Chesepeake & O. Ry. Co.*, 175 F. 321, 330, 99 C. C. A. 109; *Western Union Telegraph Co. v. Pennsylvania Co.*, 129 F. 849, 64 C. C. A. 285; *Llanelly Ry. & D. Co. v. London & N. W. Ry. Co.*, L. R. 8 Ch. App. 942, 949; *Great

*Northern Ry. Co.* v. *Manchester, S. & L. Ry. Co.,* 5 De G. & S. 138, 146.

Nor can we regard the possibility that the contract might be terminated within a year by mutual consent as sufficient to remove it from the operation of the statute. The rescission of a contract is itself a new contract. It is the substitution of a new agreement for the old. See *Yale Co-operative Corporation* v. *Rogin,* 133 Conn. 563, 567, 53 A. 2d 383; *Boston Lumber Co.* v. *Pendleton Bros., Inc.,* 102 Conn. 626, 633, 129 A. 782; *Woodbridge Ice Co.* v. *Semon Ice Cream Corporation,* 81 Conn. 479, 483, 71 A. 577. It cannot be regarded as performance of the original contract. It is a destruction of that contract and not the less so because it is rightful. See *Savage Arms Corporation* v. *United States,* 266 U. S. 217, 220, 45 S. Ct. 30, 69 L. Ed. 253.

It may be said that it is unreasonable to attribute to these parties an intention that their contract should be perpetual and go on and on for decades or even longer. That is undoubtedly true, and we do not believe that such was their purpose. The trouble is that they expressed no other intent either in words or by fair implication. They left the time for performance entirely open, and we are unable to read into their language any limitation which removes it from the statute.

The plaintiffs claim that, even though the contract as made was within the statute, it has been removed therefrom by part performance. The doctrine of part performance applies only to agreements for the sale of real estate or any interest in or concerning it. It does not operate to render enforceable contracts not to be performed within a year. *Comes* v. *Lamson,* 16 Conn. 246, 249; 2 Williston, Contracts (Rev. Ed.) p. 1542. It is true, as the plaintiffs point out, that there is

language to the contrary in *Harmonie Club, Inc.* v. *Smirnow*, 106 Conn. 243, 248, 137 A. 769, but the recital of the facts on page 245 shows that the plaintiff had fully performed its part of the contract. Upon those facts, the doctrine of part performance was not involved and the holding in the case is limited to the rule, generally recognized, that full performance by one party to an agreement removes it from the statute. 2 Williston, op. cit., p. 1471.

Even though the contract is within the statute and, therefore, unenforceable, it does not follow that the plaintiffs are barred from recovery. They have rendered valuable services to the defendant which have been accepted by it, and they are entitled to receive the reasonable value of those services. *Comes* v. *Lamson*, supra, 251; *Schempp* v. *Beardsley*, 83 Conn. 34, 37, 75 A. 141. The case, however, was tried on the theory of breach of contract, and the judgment for the plaintiffs was rendered on that basis. The plaintiffs were given judgment on the basis of the agreed commissions on orders procured by them. They were entitled only to the reasonable value of their services. It is true that the contract, which is admissible to show the circumstances under which the services were rendered, may also be some evidence of reasonable value, but it is not conclusive and it cannot support the judgment, which was rendered upon the erroneous theory of breach of a valid contract.

Since the case must be retried, it is unnecessary to consider the questions raised on the plaintiffs' appeal.

There is error on the appeal of the Superflow Manufacturing Company, Inc., the judgment is set aside as to that defendant and a new trial is ordered.

In this opinion BROWN, C. J., JENNINGS, and BALDWIN, Js. concurred.

INGLIS, J. (dissenting). The crucial question in this case is whether the contract in suit is one which could have been fully performed within a year. If it was such a contract, it clearly was not one within the Statute of Frauds. There was no specific agreement between the parties as to how long the contract was to continue in effect. What their intent was in this regard is a matter of interpretation of the contract.

The contract is executory and bilateral, calling for continuing service as brokers by the plaintiffs and compensation for these services by the defendant. In such situations the great weight of authority is that it is presumed that the parties did not intend to bind themselves in perpetuity. 1 Williston, Contracts (Rev. Ed.) p. 101. It is presumed to be their intent, unless the contrary clearly appears, that they will continue to be bound only so long as they are mutually agreeable to being bound. It is therefore held that the contract is terminable at the will of either party and upon reasonable notice to the other. 1 id., p. 104, and cases cited n. 14; 1 id. § 39. This rule of interpretation is. not limited in its application to contracts of employment or contracts for personal service involving special confidence. It controls in the interpretation of contracts for services of all kinds. *Dover Copper Mining Co.* v. *Doenges,* 40 Ariz. 349, 357, 12 P. 2d 288; *Hess* v. *Iowa Light, Heat & Power Co.,* 207 Iowa 820, 826, 221 N. W. 194; *Victoria Limestone Co.* v. *Hinton,* 156 Ky. 674, 161 S. W. 1109; *Kenderdine Hydro-Carbon Fuel Co.* v. *Plumb,* 182 Pa. 463, 469, 38 A. 480; *Stonega Coal & Coke Co.* v. *Louisville & N. R. Co.,* 106 Va. 223, 226, 55 S. E. 551. In particular, it has been applied in contracts for services as broker like the contract in this case. *Willcox & Gibbs Co.* v. *Ewing,* 141 U. S. 627, 635, 12 S. Ct. 94, 35 L. Ed. 882; *Clarkson* v. *Standard Brass Mfg. Co.,* 237 Mo. App.

1018, 1032, 170 S. W. 2d 407; *Paisley* v. *Lucas,* 346 Mo. 827, 843, 143 S. W. 2d 262. The interpretation of contracts for the future sale and delivery of commodities is guided by the same principle. *Irish* v. *Dean,* 39 Wis. 562, 568; *Marble* v. *Standard Oil Co.,* 169 Mass. 553, 561, 48 N. E. 783; *Echols* v. *New Orleans, J. & G. N. R. Co.,* 52 Miss. 610, 613. It has also been applied to the interpretation of other kinds of contracts. *Chattanooga R. & C. R. Co.* v. *Cincinnati, N. O. & T. P. Ry. Co.,* 44 F. 456, 458; *Rosenblatt* v. *Weinman,* 225 Pa. 200, 202, 74 A. 54; *Childs* v. *Columbia,* 87 S. C. 566, 572, 70 S. E. 296. The authorities cited in 17 C. J. S. 887, § 398, and in 12 Am. Jur. 861, § 305, to support the quotations therefrom appearing in the majority opinion to the effect that the presumption is that the parties to such a contract intended that the contract would remain in force until terminated by mutual consent are few in number and represent the minority view.

A distinction is to be noted between a contract such as the one involved here and such contracts as those in suit in *McKell* v. *Chesepeake & O. Ry. Co.,* 175 F. 321, 99 C. C. A. 109; *Pittsburgh, Ft. W. & C. Ry. Co.* v. *Reno,* 123 Ill. 273, 279, 14 N. E. 195; *Cohen* v. *Bartgis Bros. Co.,* 264 App. Div. 260, 35 N. Y. S. 2d 206, aff'd, 289 N. Y. 846, 47 N. E. 2d 443; *Fish Clearing House, Inc.* v. *Melchor, Armstrong, Dessau Co.,* 174 Wash. 539, 542, 25 P. 2d 381; *Droste* v. *Harry Atlas Sons, Inc.,* 145 F. 2d 899. In all of these cases, the consideration, or at least a substantial portion of it, for the promise to perform for an indefinite time had already passed at the time the term of the contract commenced. Under such circumstances it was clear that it could not have been the intention of the parties that the promisor, having already received his consideration for his

promise, should be privileged to terminate his obligation at his own will.

In the present case, there is nothing in the circumstances attending the making of the contract which tends to overcome the presumption that the parties intended the arrangement agreed upon to continue only so long as was mutually agreeable. Indeed, both the fact that neither party was bound by the contract to expand their or its organization or facilities and the fact that the plaintiff's compensation was to be measured by each individual order procured tend to fortify that presumption in this case. The contract was, therefore, terminable at the option of either party. Inasmuch as either could terminate the arrangement within a year after it was agreed upon, the contract was not within the Statute of Frauds.